# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs October 8, 2013

## STATE OF TENNESSEE v. JEFFERY W. DEAN

**Appeal from the Circuit Court for Robertson County**
**No. 2011-CR-267     Michael R. Jones, Judge**

---

**No. M2013-00340-CCA-R3-CD   Filed October 24, 2013**

---

Appellant, Jeffery W. Dean, challenges his convictions for aggravated kidnapping and carjacking, for which he received concurrent sentences of thirteen years. In this appeal, he contends that the evidence was insufficient to sustain either of his convictions. Following our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

R.N. "Bo" Taylor, Nashville, Tennessee, for the appellant, Jeffery W. Dean.

Robert E. Cooper, Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case involves the aggravated kidnapping and carjacking of the victim, Demetria Cantrell, from a Walmart parking lot in Springfield, Tennessee.

The victim testified as the State's first witness. She stated that on September 24, 2010, she drove a 2003 silver Chevrolet Cavalier that was owned by her mother. That evening, she drove to Walmart and parked on the side of the building. After shopping, she left the store and walked toward her car. As she was about to open her car door, she heard the sound of footsteps running behind her. She turned around, jumped, and screamed, at which point appellant "looked [her] dead in [the] eyes" and told her to take him where he needed to go or he would kill her. It appeared that appellant was holding something with his

right hand as if to threaten or scare her, but it was concealed under his shirt. The victim testified that appellant's eyes looked "[a]s though he meant every word he was saying."

The victim stated that she allowed appellant to enter her car and sit in the back seat as he requested. She asked appellant why he was doing this, and he responded that he did not intend to frighten her but that someone was trying to "jump" him and he was trying to escape. However, the victim was so terrified that she did not know whether to believe him. She shifted the car into reverse and began to leave the parking lot. Appellant stated that he wanted to be taken to Taco Bell. As they drove, he changed his mind and said that he would rather be taken to Wendy's. The victim was worried because based on the distance to Wendy's, she would have to be in the car with appellant for a longer time. She searched the road for police, intending to "drive crazy" or operate her lights to get their attention, but she saw none.

The victim testified that after she executed a turn, appellant eased forward from the back seat and began looking at her purse in the passenger's seat. She became fearful that he was going to rob her, so she asked if appellant still wanted to be taken to Wendy's. He responded in the negative and told her to keep driving straight without making any turns. The victim believed appellant's demeanor to be extremely threatening. His face was almost to her seat when he gave her the instructions, and she could not see his hands. She thought that if she ever wanted to see her family, she would have to "hop" out of the car when she could. She knew that to travel "straight" would be to travel toward Cedar Hill or perhaps Kentucky, in a rural area. She was scared because it was dark, she was alone, and she had a petite build. When they arrived at a red traffic light, she eased off her seat belt, gently placed her car into park, opened the car door, and started running toward a bar across the street. To do so, she had to dodge oncoming traffic. She did not turn around at all until she reached another vehicle in the parking lot. When she did, she saw her car being driven away by appellant.

The victim explained that when she arrived at the parked SUV, she began beating on the window and screaming for help. A young man exited the SUV and asked what was wrong. She jumped into his SUV and asked him to get in and lock the door because she was terrified. When the victim calmed down enough to explain the events to the man, he dialed the police for her. After placing the call to the police, the victim borrowed his telephone to call her mother. An officer drove her home, and after she spoke with her mother for a while, she realized that her telephone had a tracking device on it and that her telephone was inside her purse, which was still in her car. When the victim fled from the car, she left all of her belongings behind. When an officer arrived at her home, he and her step-father used a computer in the house and tracked her telephone. Based on the tracking device, officers located the car and returned it to her. However, it had been damaged. The air conditioner had been knocked out, and the bumper was damaged. The victim confirmed that appellant

did not have permission to take her car. She never received any of the items that she left in the car except for her driver's license, which was mailed back to her with no return address.

The victim testified that a detective showed her several photographs on a digital camera, and she identified appellant as the person who committed these acts. She identified appellant in court as the perpetrator. She confirmed that when appellant accosted her, she felt that she did not have a choice in letting him into her car and that she felt extremely scared during the ordeal.

On cross-examination, the victim stated that she had viewed the security footage from Walmart. She stated that the police told her that appellant had been "after" other women at Walmart prior to his accosting her and that she had seen appellant engaging in such behavior when she viewed the video footage.

Cathy Lee Ferrell was the State's next witness. Ms. Ferrell was employed by Walmart as an asset protection manager. She stated that Walmart had video surveillance covering all areas of both the front and the side parking lots. Reviewing the video footage, Ms. Ferrell noted that appellant arrived at 6:26 p.m. on September 24, 2010, and exited a vehicle just outside of the "general merchandise" entrance. Appellant was inside the store for approximately forty-five seconds, during which time the driver of the vehicle circled the parking lot. Appellant then exited the store and approached the vehicle, which was then out of the line of traffic and stopped alongside the garden center. Appellant opened the passenger door and displayed "very exaggerating movements, like there might be a confrontation. At that point, he's leaning down and he's talking and he . . . pushes the door very hard and slams the door and turns around and goes back into the building." From 6:29 until 6:50 p.m., appellant walked along "the front end action alley," the area in the front of the store where the restrooms were located. He would look at various areas of the parking lot and then return to the store. Ms. Ferrell characterized his movements as going "in and out and in and out of the store." He never entered the merchandise area of the store. Through Ms. Ferrell, the State entered two video recordings, one that depicted appellant's actions from 6:26 through 6:50 and another that recorded his interaction with the victim.

Ms. Ferrell narrated the second video recording, noting that at 6:50 p.m., the victim entered the camera's range. The video displayed the interaction between appellant and the victim, as well as the car being driven away from Walmart. Ms. Ferrell stated that in the first video, from 6:46 to 6:50 p.m.:

> [H]e had walked on the outside of the building to the general merchandise side. [He] [e]ntered the general merchandise side, came straight down past the restrooms, past the service desk[,] and was standing . . . near the grocery

vestibule[,] but not actually in it.  He was standing more like register two area, standing there.  Ms. Cantrell checked out on the grocery side.  She exited[,] and he was directly behind her at that point.

She noted that appellant encountered a different woman exiting the garden center at 6:35 p.m., and he looked in her direction.  That raised concerns with Ms. Ferrell.

On cross-examination, Ms. Ferrell characterized appellant's encounter with the other woman as "stalking," based on appellant's looking at her, turning around, then walking in her direction.  In her opinion, appellant turned around because he realized that the woman was parked in a "high profile position" in the front parking lot.  Ms. Ferrell alluded to a second woman in Walmart whom she felt appellant was "stalking."  She also acknowledged that due to a technical error, the footage skipped the time between 6:26 and 6:29 p.m.

Jacob Bibb testified next and stated that he was parked in a gravel parking lot near a sports bar.  He was waiting to meet some friends, and they were going to drive to Nashville together.  A friend was with him, and they were cleaning trash out of the vehicle to make room for additional occupants.  His friend exclaimed, "Somebody is coming," and he saw the victim running toward them and screaming.  She appeared to be panicked as she jumped into his vehicle.  When Mr. Bibb looked toward the road, he saw the victim's car being driven down the road.  He dialed 9-1-1 and tried to calm the victim, who was "almost hyperventilating."  The police arrived and began their investigation.

Sybill Cantrell, the victim's mother, testified next.  She stated that in September 2010, she had provided the victim with a 2003 Chevrolet Cavalier for her primary use.  On September 24, 2010, Ms. Cantrell and the victim discussed the victim's plan to go shopping at Walmart.  Later in the evening, Ms. Cantrell received a telephone call wherein she could only hear the victim crying "hysterically;" Ms. Cantrell had never heard the victim so upset.  She finally ascertained what had happened to the victim.  Before Ms. Cantrell could proceed to the location where the victim was located, she received a telephone call from the police informing her that the victim was safe with them and that they would drive her home.

Ms. Cantrell testified that upon the victim's arrival at home, the victim said that "a stranger had taken her by force and . . . stated that he wanted her to take him to his destinations[,] and if she didn't[,] . . . he had threatened to do harm to her."  The event upset the victim to such a degree that she was afraid to leave her home for "a couple of months."  Ms. Cantrell stated that it "kind of messed her up a little bit."

After the victim arrived at home, they were able to locate the victim's vehicle by utilizing the Global Positioning System ("GPS") in her cellular telephone.  They received the

vehicle from the "garage company" that located it. Ms. Cantrell confirmed that when they received the vehicle, the victim's purse was no longer in it. Rather, authorities tracked the purse to an "abandoned" location based on the GPS.

Officer Seth Lata with the Springfield Police Department was the State's next witness. He testified that he was a patrol officer on the night in question and responded to the call that originated from the parking lot next to a sports bar. When he arrived, he observed the victim, a young African-American female who was "shaken up, scared, crying, [and] trembling." She explained to him that "she had jumped from her vehicle [and] that a white male had taken her." Officer Lata opined that the victim was "terrified" and "in fear for her life" when he spoke with her. He attempted to calm the victim and determine what had happened.

Detective Madison Burnett with the Springfield Police Department testified next. He furthered the investigation by first interviewing the victim at her home. He recalled that the victim told him that she was frightened because appellant had keys to her home. Detective Burnett drove the victim to Walmart so she could demonstrate for him where and how the offenses had occurred. Based on the victim's description of appellant, Detective Burnett believed that appellant was one of several individuals with whom he had spoken earlier in the day regarding an unrelated case. During that investigation, Detective Burnett had photographed appellant and others, and as he drove the victim to Walmart, he showed her several pictures on his digital camera that he had taken earlier that day. As the victim scrolled backward through the images, she exclaimed, "Oh my God, that's him[!]" The victim appeared to become more relaxed at that point.

Detective Burnett testified that he was subsequently involved in recovering the victim's vehicle and personal property. He received a call that the vehicle had been located in a wooded area outside of the city limits, and as he was speaking with county deputies, he mentioned the appellant as being the suspect. Deputies indicated that appellant lived close by, so they proceeded to his residence, but appellant was not there. Subsequently, Detective Burnett secured a warrant for appellant's arrest and returned to his residence. His grandmother answered the door and informed officers that appellant was not there, but she allowed them to enter and verify her statement. In a bedroom in the residence, officers found the yellow shirt that appellant had been wearing on the night in question as seen in the video footage from Walmart and as described by the victim.

At the close of Detective Burnett's testimony, the State rested its case-in-chief. Appellant presented Mindy Veard, his counsel's paralegal, as his first witness. She testified that when she interviewed the victim, the victim said that she had viewed the surveillance tapes at Walmart and that she had witnessed appellant stalk two other women prior to accosting her.

Appellant testified in his own defense and stated that he was at Walmart on the night in question to borrow money from a friend who worked there. He said that he had an altercation with the driver of the vehicle from which he had exited, and he declined to re-enter the vehicle. The driver said something to appellant that made him think that the driver would try to shoot him later. Appellant had decided that if the driver returned to Walmart, he would walk inside the store. Appellant admitted he had been convicted of three prior aggravated assaults.

Appellant denied that he had approached any women at Walmart other than the victim in this case. He stated that he left the building behind another customer because he was looking for a ride. He explained that he followed the victim to her car because he needed to try to get a ride, and he told her, "[L]ook, . . . they are trying to kill me[,] and I need a way from Walmart . . . ." Appellant stated that the victim said, "Yes," but he "could tell she was spooked." He attempted to reassure her, saying, "I swear to God, I'm not trying to hurt you[;] I just need to get away from Walmart." He originally requested a ride to Taco Bell just to get away from Walmart, but he reconsidered and asked to go to Wendy's because his child's mother had a friend who worked there. He did not believe the victim was upset because they were conversing calmly.

Appellant explained that as he was riding in the victim's car, he was not paying close attention, so when she asked if he still wanted to go to Wendy's and he said to continue driving straight, he simply meant to drive to Wendy's, not past Wendy's. Appellant saw the victim take off her seat belt and place the car in park. He stated that although he had no intention of taking her car, he had been to prison before and knew that if the police arrived at the scene, he would go to jail. Thus, he drove the car to his grandmother's house and parked it. He denied removing any of the victim's belongings from the car and intimated that "some people on that road that take[] pills" were responsible for the theft of the victim's personal property. He also denied ever having his hand in his pocket when he approached the victim.

On cross-examination, appellant confirmed that he was frightened that the driver of the vehicle from which he exited would return to harm him. He acknowledged that he could have walked away, but he thought Walmart would be the safer option. Appellant did not call the police, although a police station was located within two miles of Walmart. He claimed that he left for Kentucky immediately following the incident to see his step-mother but not to flee the jurisdiction.

Appellant rested his case, and following deliberations, the jury found him guilty of aggravated kidnapping and carjacking.[1]  The trial court imposed concurrent thirteen-year sentences for both convictions.  Appellant challenges his convictions in this appeal.

## II.  Analysis

### A.  Standard of Review

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011).  To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319.  This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'"  *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).  This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our

---

[1]  We note that neither party raised the issue of whether the aggravated kidnapping was incidental to the accompanying felony, *i.e.*, carjacking.  *See State v. White*, 362 S.W.3d 559 (Tenn. 2012).  This court may review issues not raised by the parties pursuant to our "plain error" review, wherein an "appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."  Tenn. R. App. P. 36(b).  We decline to employ plain error review of this issue because we have determined that under the unique circumstances of this case, failure to give the jury instruction enunciated in *White* was harmless beyond a reasonable doubt.  *See State v. Cecil*, — S.W.3d —,  No. M2011-01210-SC-R11-CD, 2013 WL 4046608, at *12 (Tenn. Aug. 12, 2013) (holding that analysis of a *White* issue necessarily involves a harmless error analysis rather than an analysis of the sufficiency of the evidence); *White*, 362 S.W.3d at 580-81.

own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

### B. Sufficiency of the Evidence Underlying the Conviction for Aggravated Kidnapping

The elements of especially aggravated kidnapping, as charged in this case, are that appellant "knowingly remove[d] or confine[d] another unlawfully so as to interfere substantially with the other's liberty" and that he did so "with the intent to inflict serious bodily injury on or to terrorize the victim or another . . . ." Tenn. Code Ann. §§ 39-13-302, -304. Appellant contends that the evidence was sufficient to prove false imprisonment but that there was insufficient evidence of his intent to terrorize the victim.

Appellant having conceded the sufficiency of the evidence of false imprisonment, we will only address the additional element of intent to inflict serious bodily injury or to terrorize the victim. In the light most favorable to the State, the jury heard testimony from the victim that appellant declared that he would kill her if she did not drive him where he instructed her to go. The victim testified that appellant held his hand beneath his shirt in such a way that it appeared that he was concealing a weapon. Appellant changed his mind twice with regard to where he wanted the victim to drive, and the victim became fearful when he instructed her to drive toward what she considered to be a rural area. During the drive, appellant leaned forward in his seat so that he was very close to the victim. She could not see his hands at all, and she characterized appellant's demeanor as extremely threatening. Although appellant offered contradicting testimony, the jury accredited the victim's account. The jury resolved the issues of credibility of the witnesses and the weight to be given to the evidence presented, *see Bland*, 958 S.W.2d at 659, and we will neither substitute our own inferences for those drawn by the jury nor re-weigh or re-evaluate the evidence, *see Dorantes*, 331 S.W.3d at 379. Appellant is not entitled to relief on this issue.

### C. Sufficiency of the Evidence Underlying the Conviction for Carjacking

To sustain a conviction for carjacking as charged in the indictment, the State must prove beyond a reasonable doubt that appellant intentionally or knowingly took the victim's vehicle from her possession by use of force or intimidation. Tenn. Code Ann. § 39-13-404.

In a similar case, this court has opined:

> Viewing the evidence in the light most favorable to the prosecution, we conclude a rational jury could have determined that the defendant's repeated statement, "Don't make me hurt you," was intimidating to the victim and made her fear for her life, resulting in her jumping from and abandoning her car. Additionally, even after the victim jumped out of the car, the defendant kept using it, even stopping at a convenience store to purchase beer. We conclude the evidence was sufficient to show the defendant knowingly took the victim's car through intimidation or threat and to support the conviction for carjacking.

*State v. Kerry L. Dowell*, No. M2002-00630-CCA-R3-CD, 2003 WL 21486978, at *8 (Tenn. Crim. App. June 27, 2003).

Similarly, in this case, appellant accosted the victim at Walmart and told her to drive him where he needed to go or he would kill her. She stated that appellant's eyes looked "[a]s though he meant every word he was saying." She did not see a weapon, but she perceived that appellant may have been holding it in the hand that was concealed under his shirt. She became fearful when appellant changed his desired destination from Taco Bell to Wendy's, which was further away, and then again when he told her to drive straight and not make any turns. The victim was apprehensive about driving into a rural area. Appellant intimidated the victim by leaning up very close to her seat. She could not see his hands at that time, and she was still unsure about whether he held a concealed weapon under his shirt. The victim found appellant's demeanor to be extremely threatening. Believing that escape was her only option, the victim leapt from her car as soon as she could do so. After she escaped, she turned around and saw appellant drive away in her vehicle. Law enforcement officers later found her car parked at the home of appellant's grandmother. In the light most favorable to the State, and based on this court's prior opinion, the jury had before it sufficient evidence to conclude that appellant took the victim's car through threats or intimidation.

## CONCLUSION

Based on our review of the record, the briefs of the parties, and applicable legal authorities, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE